IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PATRICIA SPEER-CIHLAR, | ) |
| Plaintiff, | ) |
| | ) |
| | ) Case No: 08 C 911 |
| v. | ) |
| | ) Magistrate Judge Jeffrey Cole |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Patricia Speer-Cihlar, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Ms. Speer-Cihlar asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.

### PROCEDURAL HISTORY

Ms. Speer-Cihlar applied for DIB and SSI on October 7, 2003, alleging that she had been disabled since August 31, 2002, due to depression and frequent headaches as a result of a truck accident. (Administrative Record ("R.") 249-51, 262, 666-669). Her application was denied initially and upon reconsideration. (R. 209-224). Ms. Speer-

Cihlar continued pursuit of her claim by filing a timely request for hearing on November 3, 2004. (R. 225-26).

An administrative law judge ("ALJ") convened a hearing on May 18, 2005, at which Ms. Speer-Cihlar, represented by counsel, appeared and testified. (R. 579-680). In addition, a vocational expert, William Schweihs, also testified. (R. 93-148). On September 15, 2005, the ALJ issued a decision denying Ms. Speer-Cihlar's application for DIB because, although she could not perform any of her past relevant work, she was able to perform simple, routine light work. (R. 84-89). Ms. Speer-Cihlar filed a timely request for review of that decision with the Appeals Council.

On March 31, 2006, the Appeals Council remanded the case to the ALJ for further proceedings. (R. 65-67). The Appeals Council found that the ALJ failed to adequately consider the opinions of treating and examining sources, neglected to consider all the relevant factors in making his credibility determination, and improperly denied Ms. Speer-Cihlar's request for a supplemental hearing in light of a post-hearing consultative examination. (R. 65-66). The Appeals Council remanded the case, and instructed the ALJ to further consider and weigh the opinions of treating and examining sources, re-evaluate Ms. Speer-Cihlar's subjective complaints, obtain medical expert testimony if necessary, further evaluate Ms. Speer-Cihlar's mental impairment in keeping with Social Security regulations, revisit her residual functional capacity providing appropriate rationale, and if warranted, obtain testimony from a vocational expert, making sure to resolve any conflicts between that and the Dictionary of Occupational Titles. (R. 66).

The ALJ convened Ms. Speer-Cihlar's second administrative hearing on January 18, 2007. (R. 151-208). Ms. Speer-Cihlar again appeared and testified, and was represented by the same attorney. (R. 149). Mr. Schweihs again provided vocational expert testimony. (R. 149). On April 25, 2007, the ALJ issued a second unfavorable decision, finding Ms. Speer-Cihlar not disabled because she could perform simple, unskilled light work, (R. 20-28). This became the final decision of the Commissioner when the Appeals Council denied Ms. Speer-Cihlar's request for review of the decision on September 26, 2007. (R. 6-8). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Speer-Cihlar has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Ms. Speer-Cihlar was born on March 31, 1961, making her forty-six years old at the time of the ALJ's decision. (R. 249, 666). She is 5' 5" and weighs 142 pounds. (R. 102). She has an eleventh-grade education. (R. 268). Ms. Speer-Cihlar has a somewhat sporadic work history. She was working part-time in the bakery section of a supermarket at the time of her hearing. (R. 333). Prior to that, she had a part-time job from April through July in 2006, preparing food at a catering firm. (R. 333). She had another part-time job at a restaurant cleaning silverware and working in the kitchen, which lasted from April 2005 to July 2006. (R. 198, 333). Her longest-lasting employment – and last full-

time job – was as a photographer for a portrait studio from March of 1996 until August of 2001. (R. 271).

## B.
## Medical Evidence

Ms. Speer-Cihlar began treating with Dr. DeSimone in August 2002, complaining of intestinal discomfort. (R. 459). Over the course of the next year, she was diagnosed with irritable bowel syndrome ("IBS") (R. 459), atopic rhinitis, rosacea (R. 339), and anxiety. (R. 340). Dr. DeSimone prescribed Bentyl and Librax for her IBS (R. 340, 459), Allegra-D for her rhinitis, and doxycyline for her rosacea. (R. 339).

When Ms. Speer-Cihlar saw Dr. DeSimone on July 22, 2003, he noted that she was "very depressed" because her son had recently been killed in an auto accident. (R. 337). At the time, she was taking Xanax for her depression; Dr. DeSimone added a prescription for Lexapro. (R. 337). During the next several months, he would also prescribe Effexor and Ativan for her depression, as well as Bentyl for her IBS and Vicodin. Ms. Speer-Cihlar was going to group sessions for bereavement counseling. Dr. DeSimone also advised her to see a medical psychiatrist. (R. 335-37).

On October 31, 2003, Dr. DeSimone filled out a Psychiatric Report in connection with Ms. Speer-Cihlar 's application for benefits. He noted that she had a flat affect, and had become more withdrawn after the death of her son. (R. 355). He related her complaints of nightmares and sleeplessness, inability to concentrate, and loneliness and despair. (R. 355). Dr. DeSimone indicated that counseling and Lexapro helped initially, but that Ms. Speer-Cihlar was more depressed at her last visit because she was laid off.

4

(R.358). As for her ability to work, the doctor said she was "very withdrawn and may have difficulty concentrating and dealing with stress at this time. (R. 358).

From November 2003, through June 2004, Ms. Speer-Cihlar sought psychiatric care from Dr. Karimi. In the main, his notes are illegible. (R. 367-68, 384-90, 665-63). However, at his initial evaluation on November 4, 2003, Dr. Karimi noted that Ms. Speer-Cihlar had been depressed since her son's recent death in a car accident. (R. 367). He assigned her a Global Assessment of Functioning ("GAF") of 60, while estimating that her highest score in the previous year was 75.[1] (R. 368). The doctor appeared to catalog several symptoms, including night terrors, tossing and turning in her sleep, sleep walking, and bed wetting. (R. 367). He noted that Ms. Speer-Cihlar was not suicidal. (R. 368). He also appeared to be concerned about her use of alcohol. (R. 367). A month later, on December 5, 2003, Dr. Karimi noted "patient has been doing poorly." (R. 389).

On December 31, 2003, Dr. Hollerauer, Psy.D.,reviewed Ms. Speer-Cihlar's medical records for the Agency, and filled out a Psychiatric Review Technique Form ("PRTF"). (R. 391-404). He indicated that her impairments were "severe but not expected to last 12 months," (R. 391), and noted that she suffered from bereavement because she lost her son in an accident four months earlier. (R. 394). The doctor also noted that "apparently depr[ession] was improving when the accident occurred." (R. 394). He concluded that Ms. Speer-Cihlar's impairment resulted in marked restrictions

---

[1] The Global Assessment of Functioning Scale indicates a "clinician's judgment of the individual's overall level of functioning." *See* Diagnostic and Statistical Manual of Mental Disorders at 32 (4th Ed., Text Revision, 2000). A GAF of 60 indicates that a person suffers from moderate symptoms of mental illness or moderate difficulty in social, occupational, or school functioning. *Id.* at 34.

on activities of daily living, moderate difficulties in social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two episodes of decompensation. (R. 401).

On March 11, 2004, Dr. Karimi diagnosed Ms. Speer-Cihlar with bipolar II disorder. (R. 388). His notes indicate that on May 18, 2004, she was "doing well" and was hopeful about a job opportunity. (R. 386). On October 19, 2004, Dr. Karimi noted a diagnosis of depression and post-traumatic stress disorder. (R. 653). Ms. Speer-Cihlar was taking Xanax and Effexor, but asked to be weaned off Effexor, apparently due to intestinal problems. (R. 653). Dr. Karimi replaced it with Lexapro. (R. 653).

On November 16, 2004, Ms. Speer-Cihlar was complaining of sleeplessness and feeling down. (R. 653). She wasn't taking her medications daily, eating properly, or exercising. (R. 653). Her affect was flat, her mood was depressed, and her thought process and judgment were poor. (R. 654). That may have been her last appointment with Dr. Karimi. She was apparently unable to afford his bills. (R. 466).

Meanwhile, Ms. Speer-Cihlar continued to treat with Dr. DeSimone. Treatment notes from March 31, 2004, indicated that she was still experiencing intestinal problems -- diarrhea and loose bowel movements. (R. 419). Her IBS medication was causing nausea and she had to stop taking it. (R. 419). At that time, Ms. Speer-Cihlar was also taking Effexor, Xanax, Seroquel for bipolar disorder, and Flexeril, a muscle relaxant. (R. 419). By August 24, 2004, she was off Seroquel. (R. 417). While her rosacea seemed controlled, she was suffering from arthralgias, or joint pain. (R. 417). Dr. DeSimone

6

listed Ms. Speer-Cihlar's medications as Effexor, Xanax, Lovastatin for high cholesterol, and Celebrex for her joint pain. (R. 417).

On December 6, 2004, Dr. DeSimone reported that Ms. Speer-Cihlar's depression had not gotten any better, but that she had been "weaned of Effexor." (R. 415). He noted that she was experiencing some side effects from medication, like "floaters" and ringing in her ears. (R. 415). She was recovering from a total abdominal hysterectomy. (R. 415). A month later on January 3, 2005, Dr. DeSimone noted that her depression improved and that Ms. Speer-Cihlar was going to start taking Lexapro again. (R. 412).

On March 9, 2005, Ms. Speer-Cihlar complained that her diverticulitis was acting up. (R. 410). Her surgical scar was not healing well. (R. 410). At that time, Dr. DeSimone completed a form for Ms. Speer-Cihlar's attorney stating that Ms. Speer-Cihlar suffered from diverticulitis and depression, and that her depression affected her physical condition. (R. 405, 406). He noted that she exhibited symptoms of abdominal pain, depression, flat affect, nightmares, frequent crying, and poor concentration. (R. 405). The doctor felt those symptoms were severe enough to frequently interfere with her attention and concentration needed to perform even simple work tasks, and indicated that she was "incapable of even 'low stress' jobs." (R. 406). He also noted that she would need two or three unscheduled breaks during a work day which would average twenty to thirty minutes. (R. 407). He found it likely that her impairments would cause her to miss four days of work a month, and he stated that she has good and bad days. (R. 408). From a physical standpoint, however, Ms. Speer-Cihlar's impairments did not really interfere

with her ability to sit, stand, walk, lift, or carry. (R. 406-07). Dr. DeSimone said her impairments had lasted, or were expected to last, at least twelve months. (R. 405).

On April 8, 2005, Ms. Speer-Cihlar attempted suicide by taking ten Xanax, and was admitted to the St. Francis Hospital ER. She explained that this was over the loss of her son. (R. 476-79). Once she was medically cleared there, she was transferred to Methodist Hospital for psychiatric placement. (R. 483, 486). At Methodist Hospital, Ms. Speer-Cihlar's medical history reflected her psychiatric hospitalization, arthritis, irritable bowel syndrome, periodic diarrhea and diverticulitis. (R. 504). She denied trying to kill herself because "[she could]not do that," and explained that she had taken so many pills so she could fall asleep. (R. 506, 509). She admitted to frequent alcohol use, and not taking care of herself or her daughter. (R. 509). She reported experiencing hallucinations. (R. 509). She was "internalized, slow, disorganized, tearful." (R. 509). Dr. J. Dizon assigned her a GAF score of 30, and felt 50 was her highest score in the past. (R. 510).[2]

On June 29, 2005, the Agency arranged for Ms. Speer-Cihlar to undergo a consultative psychological examination by Jeffrey Karr, Ph.D. (R. 470-75). She appeared disheveled, exhausted, and somewhat underweight. (R. 472, 473). She described herself as homeless – she had been staying at a friend's house – and said she

---

[2] A GAF score of 30 means behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to unction in almost all areas (e.g., stays in bed all day; no job, home, or friends). *See* Diagnostic and Statistical Manual of Mental Disorders at 34 (4th Ed., Text Revision, 2000). A GAF of 50 indicates serious symptoms or functional limitations. *Id.*

was not on medication "due to financial constraints." (R. 471). Dr. Karr, also noted that she had not "seen a psychiatrist in well over a year; again due to financial constraints." (R. 472). She cited multiple stressors, including two divorces, her son's death, and "the judicial system failing [her]." (R. 472). She was a poor historian; she denied ever having been hospitalized for psychiatric problems. (R. 472, 473). She admitted to using alcohol, but Dr. Karr felt there was no indication of overt substance abuse. (R. 475).

Ms. Speer-Cihlar discouraged easily during the examination, reflected limited persistence. (R. 473). She required frequent, repeated instructions. (R. 473). She was incorrect as to what day it was and she said the month was July rather than June. (R. 473). She gave up immediately when asked about proverbs and recent news. (R. 473). When asked to name five large cities, Ms. Speer-Cilhar responded with Chicago and five states. (R. 473). She gave up on serial sevens after 100 and 93. (R. 473). Dr. Karr concluded that Ms. Speer-Cihlar had marked limitations interacting appropriately with the public, supervisors and co-workers, responding appropriately to work pressures in a usual work setting and responding appropriately to changes in a routine work setting. (R. 468). He found her to be moderately limited in her ability to understand, remember, and carry out detailed instructions. (R. 467). Dr. Karr noted a history of alcohol abuse, absenteeism, and job terminations. (R. 468).

9

**1.**
**Plaintiff's Testimony**

At her first hearing in May of 2005, Ms. Speer-Cihlar testified about her intestinal problems. She testified that her stomach is very sensitive, and eating usually caused diarrhea within an hour. (R. 100). When asking about her stomach problems, the ALJ noted that "[he] could see [she is] upset." (R. 100). Ms. Speer-Cihlar missed a lot of work and spent a lot of days "in and out of the bathroom. It bothered the boss." (R. 101). She also testified that she sometimes had "accidents." (R. 101-02). The irritable bowel syndrome caused her to become dehydrated. (R. 104). The medication she took for this made her very tired, to a point where she would nearly pass out. (R. 104). She explained that it makes her dizzy, "like when [she] get[s] up fast or move[s] too quickly." (R. 130). This happened about twice a week. (R. 130).

Ms. Speer-Cihlar related that she had four bouts of diarrhea the day of the hearing, which she characterized as a "good day." (R. 120). When asked about what qualified as a "bad day," Ms. Speer-Cihlar responded that everything goes straight through her, she gets dehydrated, and needs to lay down and relax. (R. 120). She said "bad days" occurred three times a week. (R. 120). About twice a month, she experiences "really bad days" when she has the same symptoms in addition to an infection. (R. 120-21). Usually, Ms. Speer-Cihlar drives her children to school (R. 121), but on her bad days, the children either walk to school, or stay home to take care of her. (R. 122). She stated that her fourteen-year-old daughter is very angry with her because, since the death

10

of her son, her daughter now has to take care of her. (R. 127). The daughter's anger sometimes led to abuse. (R. 127-28)

Ms. Speer-Cihlar testified that her intestinal problems prohibited her from going to work "probably 15 to 20 days out of the month." (R. 123). She was laid off from her landscape sales job because she was absent so often. (R. 99). Ms. Speer-Cihlar testified that she would be unable to function at a job packing five items into boxes because she "can't concentrate." (R. 107). She indicated that she "wouldn't be able to stay on that task." (R. 124). Her medications played a role in these problems. (R. 131).

At the end of her first hearing, the ALJ allowed that his review of the record was hampered by the illegible notes from her psychologist. (R. 143-45, 147). He instructed Ms. Speer-Cihlar to try going to vocational rehabilitation before he made a decision so he would "feel much more comfortable allowing the benefits because then [she would be] on a plan to get somewhere." (R. 146)

At the second hearing in January of 2007, the ALJ opened the discussion noting that Ms. Speer-Cihlar had been working more, although "it may not be that steady, because [she] keep[s] losing the jobs" and wondered if her condition had improved. (R. 154). Ms. Speer-Cihlar testified that she could only work eighteen hours a week at her current bakery job due to the diverticulitis, diarrhea, and depression. (R. 159). She set up for the bakers and waited on customers. (R. 167). She worked just three days a week, from 2 p.m. to 8 p.m, which allowed her to eat in the morning so her stomach would settle by the time she went into work. (R. 166, 168). Still, she had to take frequent bathroom breaks. (R. 166). She testified she could not work more hours. (R. 196). Ms.

11

Speer-Cilhar said the bakery continued to employ her because they are "very lenient" with her and "probably should have fired [her] by now." (R. 161, 167). She had started wearing Depends to work. (R. 188). She had to take a bathroom break during her hearing. (R. 178).

She testified that she tried working at a banquet house, and did well for a while, getting promoted from position to position. (R. 160). But in the end, she was fired because she was "not consistent enough – was not reliable enough." (R. 161). She missed a lot of work and took restroom breaks for thirty minutes out of every hour several times per shift. (R. 195). She testified that she also tried to hide her diverticulitis and diarrhea from employers, especially since she worked around foods. (R. 185).

Ms. Speer-Cilhar also testified about her rotator cuff injury. She said she could not lift her arm over her head, and the injury has caused her handwriting to suffer. (R. 165). She was restricted from doing any heavy lifting. (R. 171). Again, she tried to keep this from her employer for fear of losing her job. (R. 172).

Ms. Speer-Cilhar testified that she had not sought treatment for her diarrhea and diverticulitis in the past year because she did not have insurance and could not afford it. (R. 173). She was waiting for the first available openings for physical therapy for her shoulder at the county hospital, but that would not be for another two months. (R. 172).

As to her daily activities, Ms. Speer-Cilhar testified that she could drive, cook, and go shopping as long as she is with somebody, in case she got dizzy. (R. 170). Her son helped her around the house, doing some chores and making dinner if she did not feel good. (R. 179). Her daughter did the laundry and cooked some dinners as well. (R. 180).

She has been able to go to a football game and a baseball game, and to go to the movies once a week. (R. 183). She explained that although her depression – and her problems with concentration and tearfulness – had not gone away, she had stopped seeking treatment from Dr. Karimi because he prescribed heavy medication and she slept "all the time." (R. 191).

## 2.
## Vocational Expert's Testimony

At the first hearing, the VE, Mr. Schweihs, testified that Ms. Speer-Cihlar "did very little earnings at any time since 1980 – actually ever." (R. 134). The ALJ asked Mr. Schweihs to consider a hypothetical individual limited to medium work because of diverticulitis, side effects of medications, and passing out at times, who could not work at unprotected heights or around machinery, and required access to the bathroom at least three times a day at regular intervals with opportunity to change protective garments, and could perform simple routine work with no more than superficial contact with supervisor. (R. 137). Mr. Schweihs testified that such a person could not return to Ms. Speer-Cihlar's past relevant work, but could work as a cleaner, of which there were 4,000 to 5,000 positions in the metropolitan Chicago area. (R. 137).

Continuing along in that vein, the ALJ went on to add certain limitations to that base hypothetical individual. First, he added deficiencies of concentration caused by side effects from medication, psychological problems, tearfulness and panic attacks who is unable to concentrate as much as fifteen minutes every hour. (R. 138). Second, he added "geriatric problems, good days and bad days," would miss at least one day of work a week (R. 138); Finally, the ALJ added "problems with going to the bathroom" that would

13

require five unscheduled visits to the bathroom in an eight-hour day for as much as a half hour at a time. (R. 138-39). Each time, the VE said such an individual would not be able to perform work as a cleaner. (R. 139).

At the second hearing, the ALJ again posed several hypothetical questions to the VE – who, again, was Mr. Schweihs. First, he asked the VE to assume a person "limited to light exertional, does no overhead work with the right dominant arm, access to bathroom three times a day, regular and post an opportunity to change protective garments, also limited to unskilled work." (R. 201). The ALJ asked whether such a person could perform the job plaintiff formerly had cleaning and storing silverware at the banquet house. (R. 201). Mr. Schweihs said he did not know what the exertional level of that job was, so the ALJ asked Ms. Speer-Cihlar if she could do that work now; she said "yes, probably. I think I could." (R. 202).

When the ALJ further limited his hypothetical to a person who could have no more than superficial contact with supervisors, co-workers and the general public, Mr. Schweihs indicated that such limitations would rule out the banquet hall job and Ms. Speer-Cihlar's current bakery job. (R. 203). But he indicated that other jobs existed in the region such an individual could perform, such as cleaning positions, assembly, and packing (R. 203), as well as light office jobs. (R. 204). The VE said there were "about 4,000 or 5,000" light office jobs in the region, and "about 3,000" assembler jobs. (R.

14

204-05). The ALJ then asked if there were "anything else?" (R. 205). The VE responded "Yes, adding positions I would say about the same number about 3,000." (R. 205).[3]

The ALJ then addressed some additional limitations. He asked: 1) whether those jobs were available to that same individual if she could only work eighteen hours a week (R. 205); 2) if she required irregular bathroom breaks at least five – or as many as ten -- times a day (R. 205); 3) if she had to miss work more than two days a month (R. 206); and 4) if she had deficiencies of concentration caused by side effects from medication, psychological problems, tearfulness and panic attacks and is unable to concentrate as much as fifteen minutes every hour. (R. 206). In response to each hypothetical, Mr. Schweihs said that the added restrictions would preclude work. (R. 205-06). He did allow that jobs would be available if the breaks took less than five minutes and were only five times a day (R. 205); ten breaks a day, however, would "knock out" such jobs. (R. 205). Five breaks a day of fifteen minutes would also eliminate those positions from consideration. (R. 206).

### III.
### THE ALJ'S DECISION

The ALJ found that Ms. Speer-Cihlar had not engaged in substantial gainful activity since August 31, 2002, based on her low earnings and difficulty holding jobs due to her impairments. (R. 22-23). The ALJ then found her to have the following severe impairments: diverticulosis and irritable bowel syndrome; a right rotator cuff injury; knee pain; headaches; and depression and anxiety with a history of alcohol abuse. (R. 23). The

---

[3] The word "adding" in Mr. Schweihs' answer was most likely a mistranscription of the word "packing." There are many such errors in transcription throughout the record.

ALJ then determined Ms. Speer-Cihlar retained the ability to perform light work involving simple, unskilled tasks; no overhead reaching with the right upper extremity; and access to a rest room three times during a workday at regular intervals to change protective undergarments. (R. 24). Based on VE testimony, the ALJ found that allowed her to perform work as a light office cleaner (4,000 to 5,000 jobs in the region), assembler (3,000 jobs) and packer (3,000) jobs. (R.28).

## IV.
## DISCUSSION

### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the Ms. Speer-Cihlar is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the Ms. Speer-Cihlar a meaningful judicial review. *Scott*, 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544.

### B.
### Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the Ms. Speer-Cihlar is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the Ms. Speer-Cihlar is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. Ms. Speer-Cihlar bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## Analysis

This case turns on the Seventh Circuit"s oft-repeated requirement that an ALJ build a "logical bridge" from the evidence to his or her conclusion. As already noted, it is a necessary component to any well-reasoned decision; moreover, it is the facet that allows for meaningful review. *Berger*, 516 F.3d at 544. What might satisfy one reviewer, however, does not necessarily satisfy another, as the Seventh Circuit has demonstrated in its reversals of many district court opinions wherein the judge thought the ALJ had adequately explained his or her analysis. *See, e.g., Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008); *Getch v. Astrue*, 539 F.3d 473, 481-82 (7th Cir. 2008); *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007); *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006); *Young v.*

*Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004). Or *vice versa. See Ross v. Barnhart*, 119 Fed.Appx. 791, 797, 2004 WL 3088685, *4 (7th Cir. 2004).

Here, there are numerous gaps between the evidence and the ALJ's conclusions. While some might not be terribly significant in isolation, others are. Moreover, whether individual flaws might be termed insignificant or not, the cumulative effect makes it impossible to follow the path of the ALJ's reasoning with any degree of confidence, thereby denying the plaintiff the meaningful review to which she is entitled. As such, a remand is necessary.

## 1.
### Plaintiff's Physical Ailments

To begin with, the ALJ found that Ms. Speer-Cihlar suffered from diverticulosis. (R. 23). She was diagnosed with *diverticulitis*, however, and while the terms are similar, and the conditions related, they are two different things of different severity. Diverticulosis denotes the presence of multiple diverticula – saclike mucosal outpouchings – in the colon. Most diverticula are asymptomatic, but some become inflamed or bleed. Diverticulitis, on the other hand, occurs when a diverticulum develops a perforation, releasing intestinal bacteria and causing inflammation. The problem remains localized in about 75% of patients, but the remaining 25% may develop abscess, free intraperitoneal perforation, bowel obstruction, or fistulas. Symptoms range from tenderness or pain in the left lower abdominal quadrant, to nausea, vomiting, or abdominal distention. http://www.merck.com/mmpe/index.html.

Perhaps the ALJ simply erred; after all, he notes the diagnosis of diverticulitis in the body of his decision (R. 26) and found she suffered from just that in his earlier

decision (R. 89) and diverticulitis was part of his hypothetical question to the VE. (R. 137). But there is no way to tell for sure from his opinion. If it was a merely an error, of course it would not have impacted his ultimate thinking and opinion. And if this uncertainty about what the ALJ meant were the only issue, reversal would be inappropriate. But it isn't.

What is more apparent, however, is that the ALJ failed to provide an adequate line of reasoning with regard to those restrictions. The ALJ accepted Ms. Speer-Cihlar's testimony that, in an eight-hour workday, she would require bathroom breaks once an hour. (R. 26).[4] He reasoned that any job would allow for breaks once every two hours, so Ms. Speer-Cihlar could be accommodated with just two additional breaks (R. 26) – for a total of five breaks. The arithmetic is hard to follow. Assuming a nine-to-five workday, a break every hour would mean breaks at 10 a.m., 11 a.m., noon, 1 p.m., 2 p.m., 3 p.m. and 4 p.m. That's seven breaks, not five.

Staying on the topic of five bathroom breaks a day, the ALJ said that the VE testified that such a schedule would not preclude work. But the VE's testimony on this point was not so cut and dried. The ALJ asked:

---

[4] The ALJ said, "[t]he claimant testified that she needs access to a restroom approximately once every hour and that she occasionally needs to change protective undergarments. Since an individual would have breaks at least once every two hours, this could be accommodated with only two additional restroom breaks." (R. 26). But the Commissioner dismisses the "bathroom-break" issue by arguing that the ALJ simply weighed the evidence and determined that Ms. Speer-Cihlar needed five breaks a day. (*Defendant's Motion for Summary Judgment*, at 10-11). But the text of the ALJ's decision certainly seems to indicate the ALJ is crediting Ms. Speer-Cihlar's testimony on this point. The flaw in the reasoning is the number of breaks in the workday. And it is the ALJ's decision, not the explanation of the Commissioner's attorneys, that must be reviewed. *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003)

Q: With the same individual has to go to the bathroom at irregular times at least five times during the work day, is that going to knock out those jobs?

A: I guess it really depends upon the length of time. I'm understanding a bathroom break would normally be like less then[sic] five minutes.

Q: Less then[sic] five minutes would knock them out.

A: Five times a day – no, I wouldn't say –

Q : Say ten times a day?

A: Certainly would.

(R. 205). So the preclusive effect would depend on the time away from the work station; five breaks might, or might not, be to many. More importantly, there was no testimony adduced as to the effect of hourly breaks. And again, the ALJ accepted the plaintiff's testimony that this is what she would actually require. When an ALJ fails to explain the basis in the record for his proposed functional limitations and asks hypothetical questions of vocational experts that are flawed and do not fully capture the claimant's limitations, then those errors undermine the entire analysis of what work a claimant can perform. *Young v. Barnhart,* 362 F.3d 995, 1002-05 (7th Cir.2004). Such an omission, in itself, is sufficient to warrant reversal. *See Briscoe,* 425 F.3d at 352. In this context, it should be noted that Ms. Speer-Cihlar's treating physician indicated she would need, in addition to regularly scheduled breaks, two to three additional breaks of twenty to thirty minutes each.

These are just a few instances in which the "logical bridge" is not what it might have been. Perhaps in isolation, none would be significant enough to warrant a remand. But, again, they have a cumulative effect. And these concern only Ms. Speer-Cihlar's

21

physical ailments. The gaps between the evidence and the ALJ's conclusions in regard to

Ms. Speer-Cihlar's psychological problems are far more troubling.

## 2.
## Plaintiff's Psychological Impairment

The Appeals Council specifically tasked the ALJ with evaluating Ms. Speer-

Cihlar's mental impairment in accordance with the "special technique" set forth at 20

C.F.R. §§ 404.1520a; 416.920a. The Seventh Circuit recently discussed the requirement:

> The special technique requires that the ALJ evaluate the claimant's
> "pertinent symptoms, signs, and laboratory findings" to determine whether
> the claimant has a medically determinable mental impairment. 20 C.F.R. §
> 404.1520a(b)(1). If the claimant has a medically determinable mental
> impairment, then the ALJ must document that finding and rate the degree
> of functional limitation in four broad areas: activities of daily living;
> social functioning; concentration, persistence, or pace; and episodes of
> decompensation. *Id.* § 404.1520a(c)(3). These functional areas are known
> as the "B criteria." *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 et seq.
>
> The first three functional areas are rated on a five-point scale of none,
> mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The
> final functional area is rated on a four-point scale of none, one or two,
> three, and four or more. *Id.* The ratings in the functional areas correspond
> to a determination of severity of mental impairment. *Id.* §
> 404.1520a(d)(1). If the ALJ rates the first three functional areas as none or
> mild and the fourth area as none, then generally the impairment is not
> considered severe. *Id.* Otherwise, the impairment is considered severe, and
> the ALJ must determine whether it meets or is equivalent in severity to a
> listed mental disorder. *Id.* § 404.1520a(d)(2). If the mental impairment
> does not meet or is not equivalent to any listing, then the ALJ will assess
> the claimant's RFC. *Id.* § 404.1520a(d)(3). The ALJ must document use of
> the special technique by incorporating the pertinent findings and
> conclusions into the written decision. *Id.* § 404.1520a(e)(2). The decision
> must elaborate on significant medical history, including examination and
> laboratory findings, and the functional limitations that were considered in
> reaching a conclusion about the mental impairment's severity. The
> decision must also incorporate "a specific finding as to the degree of
> limitation in each of the functional areas." *Id.*

*Craft v. Astrue*, 539 F.3d 668, 674-75 (7th Cir. 2008).

When undertaking the special technique, the ALJ reasoned as follows:

> . . . as a baseline, the claimant has been able to maintain her household and care for her two minor children while maintaining at least some form of employment. She has friends and is able to interact appropriately with other people. Consequently, the first two areas [activities of daily living; social functioning] are only mildly limited. She is able to maintain concentration and attention to complete simple tasks. She was hospitalized on two occasions in 2004 due to decompensation. However, she has not been hospitalized since then and has not received intensive outpatient mental health therapy. Consequently, she does not have marked limitations in any of these areas.

(R. 24). At that point in his decision, the ALJ had made no mention of the assessments of physicians, psychologists, or psychiatrists. And he seemed to ignore Ms. Speer-Cihlar's hospitalization following her suicide attempt in April 2005.

Elsewhere in his decision, the ALJ did mention Ms. Speer-Cihlar's suicide attempt, but given his foregoing finding, it is unclear where it fit into his "special technique" calculus. As set forth above, the ALJ found plaintiff was hospitalized just twice for episodes of decompensation in 2004. Yet, a page later in his decision, the ALJ acknowledged that Ms. Speer-Cihlar was hospitalized for a suicide attempt in April 2005 – certainly an additional episode of decompensation, and a hospitalization after 2004. This type of thing makes it difficult to follow the path of the ALJ's reasoning. Perhaps one flaw such as this would not preclude a meaningful review, but this is not the only flaw.

The ALJ expressed frustration – rightly so – with Dr. Karimi's illegible notes, but was able to glean that the doctor assigned her a GAF score of 60 in late 2003, which the

ALJ said would indicate only mild to moderate symptoms. (R. 25). More accurately, however, that would mean moderate symptoms, *see supra*, fn. 1, and moderate limitations in social and occupational functioning. *See Sims v. Barnhart*, 309 F.3d 424, 427 n.5 (7th Cir. 2002). Although the ALJ accepted what little of Dr. Karimi's assessment of Ms. Speer-Cihlar he could read (R. 26), he chose to characterize her limitations as one step further down on the "special technique" severity scale than the doctor did: mild rather than moderate. What reason did the ALJ have for making such an adjustment? Difficult to say, because he does not provide an adequate explanation for why he found Ms. Speer-Cihlar less restricted than the psychiatrist did.

Then there are the findings of Ms. Speer-Cihlar's treating physician, Dr. DeSimone. He saw her on a regular basis and prescribed her depression medications. In 2003, he said she was very depressed and withdrawn, and would have difficulty concentrating and dealing with stress. By late 2004, he remarked that her depression had not gotten any better. There was some improvement in early 2005, but by March of that year, Dr. DeSimone said Ms. Speer-Cihlar's mental state was adversely affecting her physical condition. Her symptoms would frequently interfere with concentration on even simple tasks, and preclude her from performing even low-stress jobs – exactly the kinds of jobs the ALJ determined she *could* perform. A month after this assessment, Ms. Speer-Cihlar attempted suicide. But the ALJ made no reference to any of these findings and gave no explanation for why he discounted them – if he considered them at all. While an ALJ need not address every piece of evidence in the administrative record, he

cannot simply ignore evidence contrary to his decision. *Golembiewski v. Barnhart,* 322 F.3d 912, 917 (7th Cir.2003); *Zurawski v. Halter,* 245 F.3d 881, 888 (7th Cir.2001).

The error is magnified by the fact that Dr. DeSimone was Ms. Speer-Cihlar's treating physician. Generally, "[a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). True, a treating physician's opinion is not the final word on a claimant's disability because, as the Seventh Circuit has noted, "[t]he patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007)(quotations omitted). The Seventh Circuit has remarked that "many physicians (including those most likely to attract patients who are thinking of seeking disability benefits) will often bend over backwards to assist a patient in obtaining benefits." *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006). That might have been a valid reason for rejecting Dr. DeSimone's opinion, but the ALJ provided no such rationale here. And an ALJ cannot discount the opinion of a treating source without explaining why. *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir.2003); *Dixon v. Massanari,* 270 F.3d 1171, 1176, 1178 (7th Cir.2001). This is the kind of evidence an ALJ must confront and adequately discuss. *Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004).

There are two more assessments that the ALJ also ignored: one from Dr. Dizon, who evaluated Ms. Speer-Cihlar following her suicide attempt; one from the agency

psychologist who reviewed Ms. Speer-Cihlar's file in December 2003. Not surprisingly, Dr. Dizon found Ms. Speer-Cihlar barely able to function, with a GAF score of 30. Even prior to her suicide, he estimated her score to have been just 50. In either case, he felt Ms. Speer-Cihlar's limitations were far worse than the mild ones the ALJ found she had.

The ALJ also ignored the agency psychologist's review. Dr. Hollerauer said Ms. Speer-Cihlar was markedly restricted in activities of daily living, and moderately restricted in social functioning, and maintaining concentration, persistence or pace. Perhaps the ALJ discounted Dr. Hollerauer's opinion because the psychologist also said her condition was not expected to last 12 months (he was wrong of course, it continued into the following two years), but there is no way to tell from the ALJ's decision.

So all the medical professionals in the record found Ms. Speer-Cihlar's mental impairment to impart restrictions on her ability to function that ranged from moderate to marked through the years 2003, 2004, and 2005. Yet, against this backdrop, the ALJ concluded that she was, at worst, only mildly restricted. This was not a case of "dueling doctors" in which the ALJ must pick and choose among competing opinions. *See, e.g., Books v. Chater*, 91 F.3d 972, 979 (7th Cir.1996) (ALJ must decide which doctor to believe); *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir.1995) ("[T]his is not a case of dueling doctors. This case does not involve experts with a thorough knowledge of a disease versus a perhaps parochial and biased general practitioner."). The longitudinal picture of Ms. Speer-Cihlar's impairment through this time period is fairly consistent, and not as mild as the ALJ thought it was. The ALJ simply provided no rationale for discounting so much medical opinion. As such, the Commissioner's decision must be remanded.

The only clue into what the ALJ might have had in mind to support his conclusion is his reference to Ms. Speer-Cihlar's activities and part-time work: "the claimant has been able to maintain her household and care for her two minor children while maintaining at least some form of employment. She has friends and is able to interact appropriately with other people." (R. 24). Of course, the ALJ did not couch his rejection of the medical evidence in terms of activities and part-time work trumping medical records. But even if he had, his reasoning would have been suspect.

An ALJ must "consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days a week." "Minimal daily activities ... do not establish that a person is capable of engaging in substantial physical activity." *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir.2005). Indeed, here is what Judge Posner had to say about household chores and caring for children in this context:

> The administrative law judge's casual equating of household work to work in the labor market cannot stand. [Plaintiff] *must* take care of her children, or else abandon them to foster care . . . , and the choice may impel her to heroic efforts.

*Gentle*, 430 F.3d at 867. Even the ALJ allowed that Ms. Speer-Cihlar's children – teenagers – were old enough to take care of themselves. (R. 168). So taking care of two teenagers –and the record suggests they take care of Ms. Speer-Cihlar – and having a friend or two is not a valid reason to ignore the medical evidence.

Ms. Speer-Cihlar's part-time work ought to be regarded similarly. It's not as if she has been able to maintain any of her part-time positions for very long; the ALJ acknowledged as much. (R. 23). The fact that someone is employed – especially part-time and sporadically – "is not proof positive that he is not disabled, for he may be

desperate and exerting himself beyond his capacity, or his employer may be lax or altruistic." *Wilder v. Chater*, 64 F.3d 335, 338 (7th Cir. 1995). "A person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working." *Gentle*, 430 F.3d at 867. This certainly seems to be the case, as Ms. Speer-Cihlar testified that her part-time employer was very lenient with her and was surprised they hadn't fired her. Again, this simply cannot outweigh the medical evidence regarding Ms. Speer-Cihlar's restrictions.

## CONCLUSION

The plaintiff's motion for reversal and remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED. This matter is remanded to the Commissioner for further proceeding consistent with this opinion.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 12/12/08